1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RICHARD SATERFIELD,                      Case No.  2:22-cv-1513-WBS-JDP (P)

12                  Petitioner,

13          v.                                 FINDINGS AND RECOMMENDATIONS

14   GISELLE MATTESON,

15                  Respondent.

16

17

18          Petitioner Richard Saterfield, a state prisoner proceeding without counsel, seeks a writ of

19   habeas corpus under 28 U.S.C. § 2254, contending that (1) the jury was improperly given

20   instructions regarding mutual combat and initial aggressor, which deprived him of a fair trial;

21   (2) his mandatory sentence of life without parole violates state and federal law because he was a

22   youthful offender at the time of the offense; and (3) the cumulative effect of prosecutorial

23   misconduct during closing arguments violated his Fourteenth Amendment right to a fair trial.

24   ECF No. 7.  Respondents have filed an answer.  ECF No. 16.  After reviewing the pleadings and

25   the record, I recommend that the petition be denied in part and dismissed in part.

26

27

28

1

1

**Background**

2          I have reviewed the background summary drafted by the state appellate court on

3      petitioner's direct appeal.  It is correct, and I reproduce it here:

4          *Prosecution Witnesses*

5              In May 2017 Saterfield went to a store to have lunch with Hoang
           and Hoang's friend.  When they arrived, Saterfield told the other
6          two he was not hungry and wanted to make a purchase at a nearby
           pharmacy.
7

8              Saterfield, 21 years old at the time, returned to the store about 15
           minutes later, while Hoang and his friend were still eating, and told
9          Hoang that "some guys [are] following me outside.  We might want
           to do something with them."  Saterfield did not appear nervous or
10         agitated to a store employee who saw him return and speak to his
           companions and nothing about Saterfield's behavior worried
11         Hoang's friend.

12             Saterfield was holding Hoang's backpack (bag) that had been left
           inside the vehicle that transported the group to the store; Hoang's
13         gun was inside the bag.  Saterfield and Hoang left the store together
           and had an animated conversation with two males who stood a few
14         feet away from them and "looked angry," according to Hoang's
           friend, who remained inside the store.
15
               During the confrontation, Hoang took his gun from the bag and
16         fatally shot the two males, teenage brothers Daniel "Robert" Murti
           and Sergio Murti.  Sergio died on the spot, but Robert ran away.
17
               Immediately after that shooting, both defendants got into Hoang's
18         car, and drove away as more gunshots were fired from the car.

19             Video footage and eyewitness testimony indicated that, mere
           minutes before the shooting, Saterfield crossed paths with the Murti
20         brothers and their female companion at a nearby liquor store.  After
           Saterfield left the liquor store, one Murti brother commented to the
21         other that "somebody across the street was . . . waving them down
           or saying something to them."  The Murti brothers and their
22         companion crossed the street toward the shopping mall that housed
           the store where Hoang was eating lunch.  Five minutes later, the
23         brothers' companion (who did not accompany the brothers to the
           store where Hoang was eating) heard about eight gunshots, and then
24         saw Robert swaying and walking slowly toward her, with blood on
           his white shirt.  She heard tires screeching, and around five more
25         gunshots, as Robert "lean[ed] forward," trying to duck the shots.
           The companion ran to Robert and held him as he fell to the ground.
26
               An autopsy revealed that both Murtis died from multiple gunshot
27         wounds.  Robert suffered two gunshots to the torso.  Sergio
           suffered gunshots to the torso, thigh, and buttocks.  Multiple
28         civilian witnesses who were in and around the various commercial

2

establishments near the shooting provided testimony about their percipient observations.

*Hoang's Testimony*

Saterfield did not testify; Hoang did.

Hoang explained that when Saterfield returned to the store where Hoang was eating and—while holding the bag that had been left in the car—told Hoang that "some niggas [were] following him," Hoang realized they "were in trouble and [they] might have to use" the gun that was in the bag. Hoang ate more food and then joined Saterfield (who was still holding the bag) at the front of the store. Saterfield said, "that's them right there," indicating the Murti brothers, who were walking in a parking lot towards defendants. The Murti brothers "looked mad and agitated," and were waving at defendants to come out of the store. They had their hands in their pants, suggesting to Hoang (given his experience with two episodes of gun violence in the months before this incident) that they were concealing a gun and were rival gang members who wanted to harm Hoang and Saterfield.

As defendants left the store, Saterfield passed the bag containing the gun to Hoang, and the Murti brothers advanced toward defendants, appearing "more, more agitated" and "more, more angry." They said, "What were you throwing up, nigga? Where you from?" "This is Oak Park. You don't belong here." This led Hoang to conclude the brothers were gang members asserting that defendants were "in their territory" and that the brothers thought defendants were rival gang members. Hoang thought that Saterfield may have made gang signs at them when he was away from the store while Hoang was eating. Saterfield replied that he was from Oak Park. Hoang testified that he was a gang member himself, who "grew up with gang members or in bad neighborhoods" and feared the Murti brothers would shoot him and Saterfield. He removed his gun from the bag and "racked a bullet in the chamber" "right in front of" the brothers, who continued advancing towards Hoang and Saterfield with their "hands in their pants fidgeting."

Hoang testified that he believed the brothers were armed and that "it was . . . defend [him]self or die." He fired his gun at the Murti brothers, ran to his car, and drove away with his friend and Saterfield.

*Video Evidence*

Video footage admitted at trial showed as follows: Saterfield comes to the store (holding the bag) where Hoang is eating lunch at a table with his friend, and speaks to Hoang around 11:58:12; Saterfield walks a short distance away from the table to look outside, and speaks to Hoang again at 11:58:23; Saterfield walks away from the table a second time, this time walking all the way to the front door, looks outside around 11:58:48, and walks back towards Hoang; at 11:59:04 Saterfield and Hoang together approach the front door of

the store as they look outside; around 11:59:07 the Murti brothers appear outside the store, walking parallel to the front door, on the other side of several cars parked immediately in front of the store; around 11:59:12 Saterfield opens the front door with his left hand and steps outside as, with his right arm, he extends the open bag behind him to Hoang, who takes the bag at 11:59:14, as defendants take a few steps toward the Murti brothers and away from the front door; between 11:59:15 and 11:59:19, the Murti brothers walk toward defendants; around 11:59:20, Saterfield takes a step or two closer to one of the Murti brothers, and the other Murti brother walks closer to both defendants; at 11:59:24, Hoang fires the gun.

No evidence was introduced at trial indicating that either Murti brother actually possessed a weapon at the time of the shooting.

*Closing Arguments*

The prosecutor argued to the jury that "[s]omething happened between the liquor store" and the store where Hoang was eating lunch, "[w]e know that." "Now, what we also know is that [] Saterfield almost certainly started it," because the Murti brothers' attention "appear[ed] to turn to whatever [] Saterfield [was] doing . . . across the street." "We know that [] Saterfield . . . chose to obtain the gun and bring it into play. Without that act, this is a fistfight at worst." The prosecutor's theory as to Saterfield was that he intended to kill the Murti brothers and aided the shooting by giving Hoang the bag with the gun.

As for Hoang, the prosecutor argued he was "preparing to shoot before [he] stepped outside . . . before there's an angry confrontation," which was inconsistent with a self-defense theory. "If you're terrified, if you really think your life is in danger, what do you do? You stay inside. You call the police. You ask for help. No reasonable person steps outside of safety to confront this terribly fearsome thing. Ever. You step outside when you want to confront and commit violence."

Hoang's counsel argued the Murti brothers began the escalation at the liquor store when they agreed to "go check . . . out" what Saterfield was communicating to them, across the street. Then, as depicted in the video footage, the brothers "moved up aggressively" toward defendants. Counsel argued the jury could "see the angry look on the face" of one of the brothers "at 11:59:20. Does that support what [] Hoang says that the Murtis were angry? They had their hands in their pants, which made [Hoang] believe they had a gun. It was something he's seen before." "If you know the meaning of somebody with their hands down their pants trying to convince you that they are armed to continue their progression and their escalation of this, it becomes highly significant." Counsel emphasized that "after [Hoang] racked his gun, they kept pressing up, they kept pressing up. . . . The Murtis wanted to build th[e] tension and to progress this and accelerate this." Hoang, "believed that these guys were armed," and he was "sitting there with his gun racked and that would not stop . . . the Murtis' progression. It was the Murtis' acceleration of the events."

4

1    Saterfield's counsel suggested the evidence did not demonstrate
     that Saterfield "started the ball rolling" by "do[ing] something
2    provocative over at the liquor store." Rather, Saterfield was
     "concerned" that the Murti brothers were "following [him], and
3    he's pacing" in the store, and the jury should not "guess . . . wrong"
     why Saterfield got the bag out of Hoang's car and brought it into
4    the store, because "[g]reat number[s] of people have guns for
     protection." A reasonable view of the facts could be that Saterfield
5    "took [] Hoang out there as a show of force to tell [the Murti
     brothers] to shut up and leave us alone." "Not violence.
6    Protection."

7    *Verdicts and Sentences*

8    The jury found defendants each guilty on two counts of first degree
     murder (§ 187, subd. (a)) and found true that: they committed
9    multiple murders within the meaning of section 190.2, subdivision
     (a)(3); Hoang personally and intentionally discharged a firearm
10   which caused the Murti brothers' deaths (§ 12022.53, subd. (d));
     and Saterfield personally and intentionally discharged a firearm in
11   the commission of murder (§ 12022.53, subd. (c)).

12   In July 2019 the trial court sentenced each defendant to consecutive
     LWOP terms for the two special circumstance murders. The court
13   added 25 years to Hoang's sentence and 20 years to Saterfield's
     sentence for their respective firearm enhancements. Both
14   defendants timely appealed.

15   ECF No. 17-10 at 2-7. Petitioner petitioned the California Supreme Court to review this decision,

16   but the California Supreme Court denied the petition. ECF No. 17-12 at 1.

17                                    **Discussion**

18      **I.    Legal Standards**

19          A federal court may grant habeas relief when a petitioner shows that his custody violates

20   federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

21   (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

22   Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*,

23   562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the

24   last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v.*

25   *Sellers*, 584 U.S. 122, 125 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003)

26   ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned

27   opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*,

28   621 F.3d 970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was

1    last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003)

2    ("Because the California Supreme Court denied review of Gill's habeas petition without

3    comment, we look through the unexplained California Supreme Court decision to the last

4    reasoned decision . . . as the basis for the state court's judgment.") (internal quotations omitted).

5        Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been

6    "adjudicated on the merits in state court proceedings" only if the state court's adjudication

7    resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

8    established Federal law, as determined by the Supreme Court of the United States" or (2) "based

9    on an unreasonable determination of the facts in light of the evidence presented in the State court

10   proceeding."  28 U.S.C. § 2254(d).

11       **II.**    **Analysis**

12           **A.  Jury Instructions**

13       Petitioner argues that the trial court improperly instructed the jury on CALCRIM No.

14   3471 and CAL CRIM 3472—the mutual combat and initial aggressor instructions.  ECF No. 7 at

15   9.  He contends that, in giving these instructions, the trial court improperly limited his ability to

16   present his claim of self-defense, thereby violating his right to a present a defense and to have a

17   fair trial.  *Id.*  The state court of appeal rejected these arguments in his direct appeal:

> Both defendants claim the trial court erred in instructing the jury
> with CALCRIM Nos. 3471 [Right to Self-Defense: Mutual Combat
> or Initial Aggressor] and 3472 [Right to Self-Defense: May Not Be
> Contrived].  We see no error.
>
> A. *Background*
>
> The trial court instructed the jury that "[s]ome of the[] instructions
> [might] not apply, depending on [the jury's] findings about the facts
> of the case," and that the jury had to "separately consider the
> evidence as it applie[d] to each defendant . . . separately."  The
> court also instructed on, inter alia, an aider and abettor's liability for
> an intended crime (CALCRIM No. 401), justifiable homicide due to
> self-defense (CALCRIM No. 505), and voluntary manslaughter
> culpability resulting from imperfect self-defense (CALCRIM No.
> 571).
>
> Over objection, the trial court instructed the jury pursuant to
> CALCRIM No. 3471 that: "A person who engaged in mutual
> combat or who starts a fight has a right to self-defense only if: [¶]
> One, he actually and in good faith tried to stop fighting; [¶] Two, he

indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; [¶] And three, he gave his opponent a chance to stop fighting. [¶] If a defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only nondeadly force and the opponent responded with such sudden and deadly force that a defendant could not withdraw from the fight, then a defendant had the right to defend himself with deadly force and was not required to try to stop fighting . . . .

"A fight is mutual combat when it began by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

At Hoang's counsel's request, the court added the following language not in the CALCRIM No. 3471 pattern: "The words combat and fight mean to engage in a violent struggle or battle involving physical contact and not merely to engage in a verbal argument, dispute or taunting."

At a hearing on the proposed jury instructions, Hoang's counsel argued there was no "evidence of actual mutual combat or evidence of a fight to confrontation" to justify CACRIM No. 3471. He argued that the instruction was "not for a confrontation where somebody believes there's a threat of being shot or robbed. It's not the situation we have." Saterfield's counsel argued: "[T]here's a difference between fighting and confrontation. . . . I think we had a confrontation. And both parties were involved in it, all four of them. The question is can confrontation be made equal to combat and fight."

Without objection, the trial court also instructed the jury with CALCRIM No. 3472: "A person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force."

B. *Analysis*

Saterfield contends CALCRIM No. 3471 was not supported by substantial evidence, and that its provision to the jury, combined with the prosecutor's argument, diminished the prosecution's burden of proof "on an essential element of the crime of murder," and prejudicially violated his rights to present his defense and to a fair trial. As for CALCRIM No. 3472, Saterfield acknowledges it correctly states the law "in some circumstances," but argues its provision to the jury in this case "improperly restricted the availability of self-defense," in part because it "undermined Hoang's testimony about feeling afraid of escalating violence because of his personal experience."

. . .

7

The People contend substantial evidence supported giving CALCRIM No. 3471, and, even if improper, any error was harmless because of the paucity of evidence supporting a self-defense claim.  The People further contend both defendants' appellate challenges to CALCRIM No. 3472 are forfeited for failure to object or seek to modify at trial.

### 1. *General Principles*

A trial court should give a requested instruction only if it is supported by substantial evidence, which is "'evidence that a reasonable jury could find persuasive.'" (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1243; see *People v. Leon* (2020) 8 Cal.5th 831, 848.)

"'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review.  [Citation.] Review of the adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law."  [Citation.] "'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" [Citation.] "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible [of] such interpretation." [Citation.]' [Citation.]"  (*People v. Wetle* (2019) 43 Cal.App.5th 375, 381-382.)

### 2. *Forfeiture of the challenge to CALCRIM No. 3472*

A party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party failed to object in the trial court. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 ["If defendant believed the instruction was incomplete or misleading, he 'had the obligation to request clarifying language'"].)  This rule does not apply if the instruction was an incorrect statement of law (*Hudson,* at p. 1012), nor does it apply if the instructional error affected defendant's substantial rights (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087).  Thus, in order to determine whether defendants forfeited their arguments as to CALCRIM No. 3472, we must first determine whether the instruction was a correct statement of the law and responsive to the evidence, and whether it affected defendants' substantial rights.  (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

CALCRIM No. 3472 reads: "A person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force."  This is a generally correct statement of law (*see People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333) and it was responsive to the evidence, as the record suggests that Saterfield lured the Murti brothers away from the liquor store and toward Hoang (provocation), and then escalated the situation by bringing a gun into the store and telling Hoang that he was being

followed and that the two "might want to do something" about it (intent to create an excuse to use force).

The contention that *People v. Ramirez* (2015) 233 Cal.App.4th 940 teaches that CALCRIM No. 3472 required modification in the instant case is unpersuasive.  In *Ramirez*, the appellate court concluded the instruction did not accurately state governing law as to the facts before it because "one who provokes a fistfight" still retains the right of self-defense "if the adversary resorts to deadly force."  (*Ramirez,* at p. 947, italics added.)  *Ramirez* is distinguishable, because here there was substantial evidence that Saterfield provoked a *gunfight*, not a fistfight.  A gunfight is deadly at the outset.  Having provoked a gunfight, Saterfield did not retain the right to claim self-defense in connection with the Murti brothers' deaths.

Thus, CALCRIM No. 3472 adequately instructed the jury on the law, and defendants' substantial rights were not affected.  Defendants have forfeited their challenge by failing to object or request modification in the trial court.

### 3. *CALCRIM No. 3471*

In *People v. Ross* (2007) 155 Cal.App.4th 1033, cited by all parties' briefing, the defendant was convicted of aggravated assault and battery after the trial court instructed the jury, over defense objection, that the defendant had not acted in self-defense if he had been engaged in mutual combat with the alleged victim.  (*Id.* at p. 1036.)  The appellate court reversed the judgment, explaining the doctrine of mutual combat contemplates "fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight.  The agreement need not have all the characteristics of a legally binding contract; . . . . But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*."  (*Id.* at pp. 1046-1047.)

Here, Saterfield communicated with the Murti brothers to get them to follow him across the street; he brought a gun into the store; he told Hoang that multiple males were following him and that defendants "might want to do something with them"; he pointed the victims out to Hoang as they approached the store; he gave the gun to Hoang as defendants stepped out of the store; he advanced on the Murti brothers as they initially confronted defendants; and he continued to advance on the brothers moments before Hoang fired his gun.  On those facts, a jury could reasonably find that there was at least an implied agreement to fight between Saterfield and the Murti brothers.  Accordingly, CALCRIM No. 3471 was potentially applicable to Saterfield.

. . .

As to both defendants, the prosecutor's closing argument was in line with the evidence and CALCRIM No. 3471 (as well as CALCRIM No. 3472): "If you're terrified, if you really think your

1    life is in danger, what do you do? You stay inside. . . . No
     reasonable person steps outside of safety to confront this terribly
2    fearsome thing. Ever. You step outside when you want to confront
     and commit violence."
3
     The jury was told that some instructions may not apply to the facts
4    as it found them, and that it had to "separately consider the
     evidence as it applie[d] to each defendant separately." Thus, if the
5    jury found that Saterfield started the fight and applied CALCRIM
     No. 3471 to his self-defense claim, but decided Hoang was ignorant
6    of Saterfield's role, the jury was told that the instruction did not
     apply to Hoang merely by virtue of its application to Saterfield. For
7    that reason, Hoang's contention that CALCRIM No. 3471
     "effectively negated" his self-defense theories fails to persuade, as
8    the jury would not necessarily have concluded that Hoang had no
     right to self-defense if it found that Saterfield started the fight.
9    Further, Hoang's argument ignores that the trial court instructed the
     jury (at his request) that "combat" and "fight" excluded a "verbal
10   argument, dispute or taunting." Contrary to Hoang's contention,
     any juror's belief that Saterfield started a verbal confrontation
11   would not lead to the conclusion that Hoang had no right to self-
     defense, as the jury was told the instruction did not apply to words
12   alone. For all these reasons, CALCRIM No. 3471 was properly
     given.
13

14   ECF No. 17-10 at 7-13.

15        Petitioner's claim should be denied. Generally, claims of instructional error are questions

16   of state law and are not cognizable on federal habeas review. *See Menendez v. Terhune*, 422 F.3d

17   1012, 1029 (9th Cir. 2005) ("The court's determination that this instruction was not appropriate

18   . . . resulted from interpretation of state law. Any error in the state court's determination of

19   whether state law allowed for an instruction in this case cannot form the basis for federal habeas

20   relief."). "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for

21   habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459

22   U.S. 422, 438, n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to

23   engage in a finely tuned review of the wisdom of state evidentiary rules.")).

24        A petitioner may not "transform a state-law issue into a federal one merely by asserting a

25   violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) (citing *Melugin

26   v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)). Instead, to prevail on a collateral attack of state-

27   court jury instructions, a petitioner must do more that prove that the instruction was erroneous.

28

1    *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The petitioner must prove that the improper

2    instruction "by itself so infected the entire trial that the resulting conviction violated due process."

3    *Estelle*, 502 U.S. at 72 (internal citations omitted).  Even if there were constitutional error, habeas

4    relief cannot be granted absent a "substantial and injurious effect" on the verdict.  *Brecht v.*

5    *Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

6    (1946)).  A state prisoner is not entitled to federal habeas relief unless the instructional error

7    resulted in "actual prejudice."  *Id.*  If the court is convinced that the error did not influence the

8    jury, or had little effect, the judgment should stand.  *See O'Neal v. McAninch*, 513 U.S. 432, 437

9    (1995).

10    A federal court's review of a claim of instructional error is highly deferential.  *See*

11    *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993).  A reviewing court may not judge the

12    instruction in isolation but must consider the context of the entire record and of the instructions as

13    a whole.  *See id.*  The mere possibility of a different verdict is too speculative to justify a finding

14    of constitutional error.  *See Henderson*, 431 U.S. at 157.  Importantly, "a state court's

15    interpretation of state law, including one announced on direct appeal of the challenged conviction,

16    binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see*

17    *also Romero v. Cal. Dep't of Corr. and Rehab.*, 405 F. App'x 208, 211 (9th Cir. 2010) ("The

18    California Court of Appeal's conclusion that the instructions were adequate as a matter of state

19    law binds us."); *Gonzalez v. Gonzalez*, 394 F. App'x 415, 415 (9th Cir. 2010) ("The California

20    Court of Appeal's conclusion that there was no instructional error is a binding interpretation of

21    state law.").

22    To the extent that petitioner argues that the jury instructions themselves were erroneous,

23    the issue is one of state law and is not cognizable on federal habeas review.  *See Menendez*, 422

24    F.3d at 1029; *Estelle*, 502 U.S. at 71-72.  Petitioner cannot save this claim by arguing that the jury

25    instructions violated his due process rights, because the record reflects that these instructions did

26    not infect the entire trial such that his resulting conviction violates due process.  *See Estelle*, 502

27    U.S. at 72.  The record reflects that petitioner was given an opportunity to present his defense and

28    the jury was given instructions related to self-defense in conjunction with the challenged

1    instructions.  The jury was given the appropriate array of jury instructions, and simply because

2    the jury reached an unfavorable result for petitioner does not mean that the challenged jury

3    instructions violated petitioner's due process rights.  The state appellate court's decision is not an

4    unreasonable application of, or contrary to, federal law, and I recommend that this claim be

5    denied.

6                              **B.  Eighth Amendment**

7            Petitioner argues that his mandatory sentence of life without the possibility of parole

8    violates California law, the Eighth Amendment, and the Fourteenth Amendment because he was

9    twenty-one years old at the time of the offense.  ECF No. 7 at 6.  He contends that, due to his age,

10   he was entitled to a youthful offender hearing to comply with the Eighth Amendment's

11   prohibition against mandatory life without parole sentences for juvenile offenders.  *Id.*  The state

12   court of appeal rejected these arguments in his direct appeal:

13           Saterfield contends that because he was 21 years old when he
             committed the murders, the imposition of mandatory LWOP
14           sentences violated the Eighth Amendment to the United States
             Constitution, article I, section 17 of the California Constitution, and
15           equal protection principles.  He did not raise these claims below,
             but the People agree that we should address them, and we agree
16           with the parties and reach the merits.  Having done so, we reject the
             claims.
17
18                    A. *Youth Offender Parole Hearings under Section 3051*

19           "Section 3051 affects three categories of lengthy sentences.  A
             defendant who commits his or her 'controlling offense' at age 25 or
20           younger and who receives a long *determinate sentence* becomes
             eligible for release on parole 'during his or her 15th year of
21           incarceration.'  (§ 3051, subd. (b)(1).)  When the sentence for the
             controlling offense is a *life term of less than 25 years to life*, the
22           offender becomes eligible for parole during the 20th year of
             incarceration.  (§ 3051, subd. (b)(2).)  And when the sentence for
23           the controlling offense is *25 years to life*, the offender becomes
             eligible for parole during the 25th year of incarceration.  (§ 3051,
24           subd. (b)(3).)  '"Controlling offense" means the offense or
             enhancement for which any sentencing court imposed the longest
25           term of imprisonment.'  (§ 3051, subd. (a)(2)(B).) . . . .

26           "Section 3051 has a carve-out, however . . . . Subdivision (h) of
             section 3051 expressly excludes from eligibility for a youthful-
27           offender parole hearing any inmate sentenced under the 'Three
             Strikes' law, under the One Strike law, or to life without possibility
28           of parole (LWOP) for an offense committed after the defendant

                                      12

1   turned 18." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 194
    (*Edwards*).)

2

3                      B. *The Eighth Amendment Claim*

4   Saterfield contends that in light of section 3051, judicial
    "prohibition of mandatory LWOP" to *all* defendants over 18 and
    younger than 26 "would be consistent with" the analysis in *Miller v.*

5   *Alabama* (2012) 567 U.S. 460, wherein the United States Supreme
    Court, building upon earlier cases, outlined a range of factors a

6   sentencing court should consider before ordering a juvenile to serve
    an LWOP term, consistent with the Eighth Amendment's ban on

7   cruel and unusual punishment.

8   The most recent California case to consider whether a legal adult
    may successfully invoke Eighth Amendment sentencing law that

9   pertains to juveniles, ruled: "[A] defendant's 18th birthday marks a
    bright line, and only for crimes committed before that date can he

10  or she take advantage of [that] jurisprudence in arguing cruel and
    unusual punishment." (*Edwards, supra*, 34 Cal.App.5th at p. 190,

11  citing *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.) We
    agree. Therefore, because Saterfield was 21 years old when he

12  committed his crimes, we reject his invocation of the *Miller* line of
    cases to challenge his sentence.

13      . . .

14
                       D. *The Equal Protection Claim*

15

16  Saterfield contends that because he is "similarly situated
    neurologically though not chronologically" to some teenaged
    juveniles, his exclusion from youth offender parole eligibility

17  violates equal protection principles. Citing *People v. Olivas* (1976)
    17 Cal.3d 236, at page 251, Saterfield contends we must apply strict

18  scrutiny review to this claim, as "imprisonment is a deprivation of
    the fundamental interest in personal liberty." We disagree and

19  apply rational basis review (*People v. Wilkinson* (2004) 33 Cal.4th
    821, 837 [limiting *Olivas*, and holding that rational basis review

20  generally is applicable to equal protection challenges to penal
    statues]) to conclude that this claim lacks merit.

21
    Both federal and state constitutional provisions protect the right to

22  equal protection of law. "'The first prerequisite to a meritorious
    claim under the equal protection clause is a showing that the state

23  has adopted a classification that affects two or more similarly
    situated groups in an unequal manner.' [Citations.] This initial

24  inquiry is not whether persons are similarly situated for all
    purposes, but 'whether they are similarly situated for purposes of

25  the law challenged.'" (*Cooley v. Superior Court* (2002) 29 Cal.4th
    228, 253.)

26
    By its own terms, section 3051 excludes from relief nonjuvenile

27  LWOP offenders. Saterfield cannot show that he is similarly
    situated to juvenile LWOP offenders, since "children are

28  constitutionally different from adults for purposes of sentencing."

1

2

3

4

5

6

> (*Miller v. Alabama*, *supra*, 567 U.S. at p. 471.)  Moreover, Saterfield cannot show that he is similarly situated to offenders who commit their crimes when they were younger than 25 and were not sentenced to LWOP, since such offenders receive different sentences because they have been convicted of different crimes. (*People v. Macias* (1982) 137 Cal.App.3d 465, 473 ["persons convicted of different crimes are not similarly situated for equal protection purposes"]; *see People v. Pecci* (1999) 72 Cal.App.4th 1500, 1503 ["persons convicted of different offenses can be punished differently"].)  His equal protection argument fails.

7  ECF No. 17-10 at 19-21.

8      Petitioner's claim should be denied as meritless.  First, to the extent petitioner argues that

9  the trial court misapplied state law, federal habeas relief is unavailable for errors of state law.

10  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("We have stated many times that federal habeas

11  corpus relief does not lie for errors of state law." (citations and quotation marks omitted)).  His

12  argument that the Eighth Amendment precludes his life without parole sentence also holds no

13  weight because the crimes he committed occurred when he was twenty-one years old, at which

14  time he was not a juvenile for Eighth Amendment purposes.  *See Miller v. Alabama*, 567 U.S.

15  460, 479 (2012) (holding that a mandatory sentence of life without parole for defendants *under*

16  *the age of eighteen at the time of the offense* violates the Eighth Amendment).  Finally,

17  petitioner's contention that his sentence violates his right to equal protection is unsupported by

18  any factual or legal argument within the petition, and an unsupported contention is insufficient to

19  warrant habeas relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (holding that

20  "conclusory allegations which are not supported by a statement of specific facts do not warrant

21  habeas relief").

22                    **C.  Prosecutorial Misconduct**

23      Finally, petitioner argues that the state's closing arguments rendered his trial

24  fundamentally unfair.  ECF No. 9-10.  He contends that the state improperly (1) encouraged the

25  jury to focus on passion and sympathy for the victims and their families; (2) urged the jury to find

26  petitioner guilty to send a message to the community; (3) misstated the reasonableness standard

27  for self-defense; and (4) diluted the reasonable doubt standard.  *Id.* at 9.  He contends that these

28

1  statements impacted the jury, rendering his trial fundamentally unfair.  *Id.* at 9-10.  The state

2  argues that all but one of petitioner's prosecutorial misconduct claims are procedurally barred.

3  ECF No. 16 at 25-27.  It contends that the state appellate court expressly determined that

4  petitioner forfeited all his prosecutorial misconduct claims except the claim related to the state's

5  appeal to the jury's passion and sympathy.  *Id.*

6          The state appellate court ruled the following regarding petitioner's prosecutorial

7  misconduct claims:

> Saterfield contends the prosecutor committed multiple acts of misconduct in closing argument.  The People contend all but one of his arguments are forfeited.  As we describe below, only one objection to the challenged argument was voiced by his counsel, and although Saterfield argues that we should excuse this failure to object based on futility, we disagree.  That one objection was sustained, and although the trial court declined to "strike" the argument at issue, the court was not asked to admonish the jury further and there is no indication that any further objections or properly made requests to admonish the jury would have been futile.  "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."  (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)
>
> However, because Saterfield argues that any failure to preserve a claim was ineffective assistance of trial counsel, we will address the merits of any forfeited claims of prosecutorial misconduct under the rubric of ineffective assistance of counsel.
>
> A. *General Principles*
>
> "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.  Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (*People v. Morales* (2001) 25 Cal.4th 34, 44.)
>
> "At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom."  (*People v. Morales, supra*, 25 Cal.4th at p. 44.)  "Within the scope of permissible prosecutorial argument, a prosecutor is given wide latitude during argument """"as long as it

amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. . . .""" [Citation.]"  (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529.)

"[W]e must reject" an ineffective assistance claim on direct appeal """"unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation."""  (*People v. Caro* (2019) 7 Cal.5th 463, 488.)  In the context of a failure to object to a prosecutor's closing argument, there are "'many reasons'" why "'[a]n attorney may choose not to object, . . . and the failure to object rarely establishes ineffectiveness of counsel,'" (*People v. Avena* (1996) 13 Cal.4th 394, 420-421 (*Avena*)), as "[c]ounsel could reasonably have decided it was better to let the comment[s] stand than risk irritating the jury by objecting"  (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 395 (*Anzalone*)).

B. *Alleged Instances of Misconduct*

1. *Appealing to Passions and Sympathy*

The prosecutor began his closing remarks by telling the jury: "If before this trial you were not the type of person that when you saw on the news . . . some victim being . . . wounded or killed, if you weren't the type of person that reflected on the real human cost that that involves, you will be now.  Unfortunately . . . you've learned what it looks like when people are gunned down.  You've learned what it looks like when two brothers, boys really, fifteen, nineteen, are killed.  When a family loses two sons."  Hoang's attorney objected as "[a]ppealing to passion."  The trial court sustained the objection.  Hoang's attorney then said: "Move to strike."  The court responded: "What attorneys say is not evidence, so there's really nothing to strike."

Saterfield contends that by refusing to strike the prosecutor's comment (and seemingly to admonish the jury, which we note the court was not asked to do), the trial court prejudicially failed to tell the jurors "that they could not consider passion or sympathy," and "made further objection to prevent the prejudice from repeated misconduct futile."  The People argue the isolated remark by the prosecutor was not prejudicial, and we agree with the People on this point.

The trial court sustained the objection, and though it did not specifically admonish the jury to disregard the challenged statement, it did generally instruct the jury that the attorneys' arguments were not evidence and also that the jury was to disregard attempts to appeal to its sympathy.  Further, the statement was isolated and not repeated.  (*See People v. Pensinger* (1991) 52 Cal.3d 1210, 1250-1251 [rejecting a prejudicial error argument where the prosecutor appealed to the jury's passion in closing argument when the prosecutor said "'suppose . . . this had happened to one of your children,'" defense counsel objected, and the trial court sustained the objection but did not admonish the jury to

disregard the statement, as "the prosecutor's comment was an isolated one and it was not repeated"].)

Saterfield points to two additional instances of alleged improper argument, which were not objected to, under the same subheading. First, the prosecutor said: "You've seen the cost. And you will be able to reflect in your mind that you sat on one of the most brazen, heinous, dangerous cases that could have possibly happened." Defendant contends this comment was "geared to incite sympathy and passion." But the prosecutor's characterization of the noontime shooting in a commercial area populated by multiple bystanders as "brazen," "heinous," and "dangerous" was arguably fair comment on the evidence. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 ["The prosecution's description of [the victim] 'suffering' a 'savage beating' and the comment about how it reflected defendant's 'violent capabilities' were fair comments on the evidence"]; *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized crimes as "'serial killing,'" and "'terrorizing and killing'" people].) Any objection would have merely drawn attention to the argument, whether the objection was sustained or not; refraining from objecting was arguably a reasonable tactical choice by counsel, particularly given that the remarks were not obviously improper. (*Avena, supra*, 13 Cal.4th at pp. 420-421; *Anzalone, supra*, 141 Cal.App.4th at p. 395.)

Second, in rebuttal argument, the prosecutor took issue with defense counsels' arguments that the jury should consider the "cultural divide" when judging the reasonableness of defendants' conduct. The prosecutor explained: "The argument they were making is essentially that if you grow up in a bad neighborhood, if you grow up impoverished, if you grow up in those situations, somehow we should expect you to be morally bankrupt"; and "[e]ssentially what they are saying is this is how you roll in the hood. This is how it goes. You may not understand it, but this is the way it is. [¶] Well, my question to you, ladies and gentlemen, the twelve of you, whose hood is this? And I'm talking about the courtroom. I'm talking about the City of Sacramento. . . . That's why we have these reasonableness standards in the law. [¶] . . . You guys get to say what is normal, acceptable, and reasonable."

Defendant contends "[t]his was both an appeal to prejudice" and an appeal to the jury to "'protect community values'" as the "'"'conscience of the community.'"'" First, the argument was arguably proper. (*See People v. Adanandus* (2007) 157 Cal.App.4th 496, 511-513 [prosecutor's argument that the jury could restore law and order to the neighborhood was "an appeal for the jury to take its duty seriously, rather than efforts to incite the jury against defendant," and therefore not misconduct].) Second, as explained above, even if the comments were improper, refraining from drawing attention to them by objecting was arguably a reasonable tactical choice by counsel.

1

### 2. *Misstatement of the Law of Self-Defense*

2  Defendant contends that the prosecutor misstated the law of self-
defense by suggesting that defendant's "understanding of the
3  situation" was irrelevant to the question of self-defense, as "only
the jury's own standards" were relevant.  He points to two
4  statements to the jury by the prosecutor: that the jury was entitled
"'to say what is normal, acceptable and reasonable,'" and that the
5  jury "ha[d] to agree that what [Hoang] did was righteous in order to
find that it's reasonable."  Saterfield adds that the prosecutor's
6  critique of defense counsel's closing argument regarding a cultural
divide exacerbated what he characterizes as a misrepresentation of
7  the law regarding reasonableness.

8  This claim fails for the same reasons explained above.  Counsel
reasonably could have decided it was better to let the comments
9  stand rather than draw more attention to them by objecting.  (*Avena,
supra*, 13 Cal.4th at pp. 420-421; *Anzalone, supra*, 141 Cal.App.4th
10  at p. 395.)

11

### 3. *Misrepresentation of Burden of Proof and Reasonable Doubt Standard*

12

13  Saterfield contends that the prosecutor incorrectly described the
standards that apply to self-defense and misstated his burden to
14  show defendants did *not* act in self-defense when he told the jurors
to rely on their common sense and experience when deciding
15  whether defendants reasonably believed they had to act in self-
defense, rather than considering the scenario from defendants'
16  perspectives.  He cites as authority for that argument only a single
case that is not at all on point to his contention; we see no
17  misconduct in arguing objective reasonableness.  Where there is no
objectionable conduct by the prosecutor, there is no ineffective
18  assistance by counsel's failure to object.  Further, we cannot see
how refraining from objecting to these closing comments could not
19  be a reasonable tactical decision by counsel, considering the
instructions that the jury were given and counsel's reliance on those
20  to argue his case.  The prosecutor's comments, in the context of
argument that spans over 50 pages of reporter's transcript, were not
21  so offensive that trial counsel could not have made a reasonable
tactical decision to not emphasize them.  (*Cf. People v. Tully* (2012)
22  54 Cal.4th 952, 1052 ["remarks occupy[ing] fewer than two pages
in an argument that spans over a hundred pages of reporter's
23  transcript" "were a minor point in an extensive argument"].)

24  Saterfield's claim of prosecutorial misconduct fails, . . .

25  ECF No. 17-10 at 14-19.

26  Petitioner's claims related to the state's arguments urging the jury to find petitioner guilty

27  to send a message to the community, misstating the reasonableness standard for self-defense, and

28

1    diluting the reasonable doubt standard should be dismissed as procedurally defaulted, and

2    petitioner's remaining claim regarding the state's appeal to the jury's passion and sympathy

3    should be denied.  As a matter of comity, federal courts "will not review a question of federal law

4    decided by a state court if the decision of that court rests on a state law ground that is independent

5    of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S.

6    722, 729 (1991), *superseded on other grounds by* 28 U.S.C. § 2254(b) and *overruled on other*

7    *grounds by Martinez v. Ryan*, 566 U.S. 1 (2012).  For a claim to be procedurally barred, the

8    petitioner must have actually violated a state procedural rule, *see Wells v. Maass*, 28 F.3d 1005,

9    1008 (9th Cir. 1994), and the highest state court to consider the claim must have actually relied on

10   the procedural default to deny the claim, *see Harris v. Reed*, 489 U.S. 255, 261-62 (1989);

11   *Loveland v. Hatcher*, 231 F.3d 640, 643 (9th Cir. 2000).

12        For a state procedural rule to be found "independent of the federal question," *Coleman*,

13   501 U.S. at 729, the state law basis for the decision must not be interwoven with federal law,

14   *Cooper v. Neven*, 641 F.3d 322, 332 (9th Cir. 2011); *Bennett v. Mueller*, 322 F.3d 573, 581 (9th

15   Cir. 2003); *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001).  To be "adequate to support

16   the judgment," *Coleman*, 501 U.S. at 729, the rule must be "firmly established and regularly

17   followed" at the time of the purported default, *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (quoting

18   *Lee v. Kemna*, 534 U.S. 362, 376 (2002)); *see Fields v. Calderon*, 125 F.3d 757, 760 (9th Cir.

19   1997) (holding that the question of whether a state procedural bar is clear, consistently applied,

20   and well-established is determined as of the time the purported default occurred, not when a state

21   court applied the bar to a claim).

22        The state bears the initial burden of pleading the existence of an independent and adequate

23   state procedural ground.  *Williams v. Filson*, 908 F.3d 546, 577 (9th Cir. 2018); *Bennett*, 322 F.3d

24   at 585-86.  If the state makes this initial showing, the burden shifts to the petitioner to

25   demonstrate that the procedural ground is not adequate.  *Williams*, 908 F.3d at 577.  If the

26   petitioner makes such a showing, the burden shifts back to the state to make a showing in rebuttal.

27   *Id.*

28

19

A federal court may elect not to apply an otherwise-valid procedural bar in two narrow circumstances: if the petitioner can demonstrate cause for the default and prejudice as a result of the alleged violation of federal law, or if the petitioner can show that failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750; *see also Martinez*, 566 U.S. at 9-10; *Maples v. Thomas*, 565 U.S. 266, 280 (2012).  Ineffective assistance of counsel may constitute cause for the federal court excusing an otherwise valid procedural default.  *See Martinez*, 566 U.S. at 9.

The record demonstrates that petitioner's trial counsel failed to object to the state's closing arguments related to finding petitioner guilty to send a message to the community, misstating the reasonableness standard for self-defense, and diluting the reasonable doubt standard.  In his direct appeal, petitioner attempted to challenge the state's arguments on those points, acknowledging that his trial counsel failed to object at trial, but arguing that the failure to object should be excused due to ineffective assistance of counsel.  ECF No. 17-10 at 14.  However, before this court, petitioner makes no such arguments.  Petitioner only argues that the state's closing arguments were improper, and he acknowledges neither that his counsel did not object to these instructions at trial nor the state appellate court's forfeiture findings.  *See* ECF No. 7 at 6, 9-10.  As such, petitioner has not overcome the procedural bar on this claim, and I decline to review the claim's merits regarding these specific state arguments.

To petitioner's remaining preserved claim, such argument still fails.  In reviewing a prosecutorial misconduct claim, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial."  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quotations omitted) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*,

455 U.S. 209, 219 (1982). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (quotations and citation omitted).

Petitioner's contention that the state's appeal to the jury's passion and sympathy towards the victims should fail because the state's arguments did not infect the trial with unfairness to the point that the petitioner's conviction is the result of an unfair trial. *See Greer*, 483 U.S. at 765. First, the jury was instructed that closing arguments were not evidence, and that they should ignore appeals to sympathy—federal courts presume that the jury followed these instructions. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (denying a petitioner's prosecutorial misconduct claim by noting that "the court instructed the jury that '[s]tatements made by the attorneys during the trial are not evidence' and that the jury 'must not be influenced by mere . . . sympathy [or] passion,' and explaining that the court 'presume[s] that the jury followed the instructions.'"). Moreover, the evidence supporting petitioner's conviction is strong, further cutting against his argument. *See id.* at 713-14 (citing the strength of the evidence against petitioner in denying his prosecutorial misconduct claim). Finally, the state's comment was isolated in context of the entirety of the trial. *See Sassounian v. Roe*, 230 F.3d 1097, 1107 (9th Cir. 2000) (looking to the isolated nature of the state's comments in denying petitioner's prosecutorial misconduct claim). Thus, the state appellate court's resolution of this issue was not contrary to, or an unreasonable application of, federal law, and petitioner's challenge against the state's comments meant to appeal to the jury's sympathy and passion should be denied.

Accordingly, it is hereby RECOMMENDED that:

1. The petition, ECF No. 7, be DENIED in part and DISMISSED in part;

2. The court decline to issue the certificate of appealability referenced in 28 U.S.C. § 2253; and

3. The Clerk of Court be directed to close this case and to enter judgment accordingly.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    May 12, 2025

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE